IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

KEVIN SCOTT PETERSON        §
                           §
VS.                        §        CIVIL ACTION 4:06-CV-332-Y
                           §
CITY OF FORT WORTH, TEXAS  §

<u>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT</u>

This is a case involving allegations of unlawful seizure and excessive use of force by two police officers of the City of Fort Worth, Texas, police department ("FWPD"). Plaintiff Kevin Peterson has sued the City of Fort Worth ("the City") under 42 U.S.C. § 1983 and the Texas Tort Claims Act, section 101.002, *et seq.,* complaining that the City violated his Fourth Amendment rights and is liable for the tortious acts of its police officers. The City has filed a motion (doc. #20) for summary judgment on all of Peterson's claims. For the reasons stated below, the Court concludes that the motion should be GRANTED.[1]


I.    Factual Background[2]

In celebration of a friend's birthday, Kevin Peterson and his wife, Jodi, went to a restaurant called *Riscky's BBQ* on August 14, 2005. The restaurant is located in an area of Fort Worth, Texas, known as the stockyards.[3] They parked their extended-cab pick-up

---

[1] In his response to the City's summary-judgment motion, Plaintiff makes certain objections to the City's evidence. The Court sustains those objections.

[2] Because the City has moved for summary judgment, the Court will view the facts and draw all reasonable inferences in light most favorable to Plaintiff.

[3] The stockyards is a national historic district in Fort Worth, Texas. The district celebrates Fort Worth's history as a livestock meet-packing center. It features shopping, dining, a rodeo, and other attractions.

truck in a parking lot near an establishment called *Billy Bob's Texas*.[4] After dinning, the Petersons walked to a dance club called *The Cantina Cadillac*. While at the club, Kevin Peterson consumed approximately six to eight beers and his wife Jodi consumed approximately three to four beers. The Petersons arrived at the club around 10:00 p.m. and remained there until it closed at 2:00 a.m.

After *The Cantina Cadillac* closed, the Peterson's walked back to their pick-up truck. Because of their level of intoxication, the Petersons decided not to drive home, but to sleep in their truck. Kevin Peterson climbed into the back of the truck and lay down to sleep and Jodi Peterson got into the front seat and leaned back to sleep.

Officer Samantha Horner was on patrol when she received a call regarding a suspicious person/vehicle parked near *Billy Bob's Texas*. She was the primary officer who responded to the call and Officer Roger Ballard was dispatched to assist. They arrived on the scene around 5:00 a.m.

A security guard directed the officers to the Petersons' pick-up truck, which was parked back by "the catwalk."[5] As they approached, the officers observed a female in the front passenger

---

[4] The record is not clear whether the Petersons parked in a parking lot open to the public or whether they parked in an area reserved for individuals who are participants in the rodeo. Kevin Peterson claims he parked where the rodeo participants parked because he was a former rodeo participant and his son is currently a rodeo participant. For purposes of this motion, the Court accepts that the Petersons parked in a lot that was not open to public parking.

[5] Officer Ballard states that the pick-up was parked in a dark area and in a place that was not designated for parking, thereby raising his suspicions.

seat and a male laying in the back seat.[6]  The officers identified themselves but did not receive a response from either person.

Officer Horner opened the rear door and shook Kevin Peterson's leg telling him to wake up.  When he did not respond, Officer Horner used her ASP baton and gave Kevin Peterson "a sternum rub."  Kevin Peterson kicked at officer Horner and told her to leave him alone.  Officer Horner explained to Kevin Peterson that she had been called by security and that he needed to wake up, but he went back to sleep.

Officer Horner reached in to wake Kevin Peterson and he swatted at her hand and told her to go away.  Officer Horner told Kevin Peterson that she was a police officer and that he did not want to hit her.  She further told him that he needed to get out of the truck so she could speak with him.  Instead, Kevin Peterson went back to sleep.

Officer Horner then reached in and grabbed Kevin Peterson's arm.  Kevin Peterson responded by hitting Officer Horner on her forearm.  She informed Officer Ballard that she'd just been hit and he came over to the passenger side to assist her in removing Kevin Peterson from the truck.[7]

---

[6] Officer Ballard states that he observed Jodi in the front passenger seat with her pants unbuttoned and pulled down to her mid-thigh region.  He said Kevin Peterson was in the rear dressed only in blue jeans; he did not have a shirt on.  Officer Horner states that Jodi Peterson's pants were unbuttoned.  Jodi Peterson denies that her pants were unbuttoned or pulled down to her mid-thigh region, and Kevin Peterson denies being shirtless.

[7] Officer Ballard states that Officer Horner shook Kevin Peterson's legs and he began to stir and kick his feet.  He states that Officer Horner identified herself as a police officer and ordered Kevin Peterson to stop kicking.  Officer Ballard said that Kevin Peterson continued to kick and kicked Officer Horner in the chest.  He states that Officer Horner stepped back to avoid being kicked again and he stepped into the doorway and ordered Kevin Peterson to stop kicking.  When he continued, Officer Ballard states he reached in, grabbed Kevin Peterson

According to Kevin Peterson:

> The first thing I remember upon waking up was
> I was being drug out of the truck by my
> clothes. I was laying on my back. I actually
> hit the ground. The door was opened, and they
> drug me out. I was sliding on my back on the
> ground; and I had two police officers on me
> wrestling me to the ground . . . . And then
> they rolled me over and put my hands behind my
> back and put cuffs on me.
>
> . . .
>
> At that point I didn't know what was going on
> or who they were because nobody said . . .
> this is the police or anything.

(Pl.'s App. at 144-45.) After being handcuffed, Kevin Peterson

said they stood him up. He recounted,

> They grabbed . . . the cuffs by the chain and
> . . . pulled me up. I was face down, and they
> pulled me up by my arms [and] my hands . . . .
> They just jerked me up off the ground and . .
> . spun me around [and] slammed me up against
> the bed of the truck . . . . [T]here wasn't
> any struggle with me . . . . I'm waking up
> and becoming more aware . . . . [T]here was a
> woman on the right and a man on my left. He
> had his hands on my shoulders . . . and she
> had her hands on me, too.
>
> And I noticed hey, these are cops . . . . So
> that was the first time when I got to my feet
> that I knew that I was being cuffed by police
> officers . . . . I didn't say anything at
> this point.

(*Id.* at 145.) Kevin Peterson continued,

> I was being cussed by the male officer . . . .
> The male officer was screaming in my ear. He
> was on my left, and he was saying you
> motherfucker. And he reared back and kneed me
> in the thigh with his knee . . . . [W]hen he
> did it, I cringed. I go ugh, . . . and I was
> . . . immediately enraged because it was

---

by his belt and pulled him from the truck.

totally unnecessary for him to beat on me when
I was in cuffs.

(*Id.* at 146.)  Kevin Peterson stated that Officer Ballard took his

billfold out of his pocket and took out his driver's license.  He

explained,

> [W]hile he was looking for my license . . .,
> the woman cop opened . . . the front seat door
> where Jodi was sleeping and woke her up . . .
> . [S]he said Ma'am, is this your husband; and
> Jodi said yes.  So Jodi is coming around [and]
> . . . the lady officer tells her to stay
> seated, so she sits down in the truck . . . in
> the passenger seat.  And the whole time my
> leg's . . . pounding . . . .
>
> [T]he male officer takes my driver's license
> to his car, runs [it] and doesn't find any
> warrants or anything wrong where he can haul
> me to jail.  So he brings back my license and
> puts it in my billfold, leaves my billfold
> sitting up on my truck, uncuffs me, and they
> get in their cars and leave.

(*Id.*)

Because they felt they were still too intoxicated to drive,

the Petersons got back in their truck and stayed at the parking lot

until around 7:00 a.m.  Thereafter, the Petersons drove home and

Kevin Peterson planned on laying in bed until the pain in his leg

subsided.  But after he took his jeans off, Kevin Peterson realized

that he needed to go to the hospital.  At the hospital, the doctors

diagnosed Kevin Peterson with a ruptured femoral artery and he

underwent two surgeries.  He stayed in the hospital for nearly two

weeks recovering from his injury and surgeries.  Kevin Peterson

contends that Officer Ballard's hard knee strike to his thigh

ruptured his femoral artery.[8]


II.  Analysis

    A.  Summary Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c).  An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham."  *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)). Facts are considered "material" if they "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material.  *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990).  Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party.  *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793,

---

[8]  Officer Ballard denies giving a knee strike to Kevin Peterson's thigh and he denies using any abusive language.  Officer Horner, however, states that Officer Ballard did give Kevin Peterson a knee strike.  She describes the knee strike as "an approved distraction technique" Officer Ballard used so that he could secure Peterson and prevent his continued resistence.  (Pl.'s App. at 121.) Officer Ballard, on the other hand, described Kevin Peterson's resistence as minimal and denied that a knee strike was used or even necessary.  He further states that after waking and becoming alert to his surroundings, Kevin Peterson apologized for striking Officer Horner.  Officer Ballard claims that the two of them had a cordial conversation for about fifteen minutes where Kevin Peterson recounted his and Jodi's decision to sleep in their truck because they felt to intoxicated to drive.  Officer Ballard states that he told Kevin Peterson that he appreciated their decision not to drink and drive and he allowed them to return to their truck to go back to sleep.

795 (5th Cir. 1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989). In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). A defendant moving for summary judgment may submit evidence that negates a material element of the plaintiff's claim or show that there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.*, 477 U.S. at 322-24; *Crescent Towing and Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994); *Lavespere*, 910 F.2d at 178.

To negate a material element of the plaintiff's claim, the

defendant must negate an element that would affect the outcome of the action. *See Anderson*, 477 U.S. at 247. If the defendant moves for summary judgment alleging no evidence to support an essential element of the plaintiff's claim, the defendant need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the defendant need only show that the plaintiff, who bears the burden of proof, has adduced no evidence to support an essential element of his case. *See Celotex*, 477 U.S. at 325; *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 379 (5th Cir. 1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

B.   Standard for Municipal Liability

"It is clear that a municipality may not be held liable under section 1983 on the basis of *respondeat superior*." *Johnson v. Nacogdoches County, et al.,* 379 F.3d 293, 308 (5th Cir. 2004); *Monell v. Department of Social Services,* 436 U.S. 658, 694 (1978).

To establish municipal liability under section 1983, a plaintiff must prove three elements: (1) a policy (2) of the municipal's policymaker (3) that is the moving force behind a violation of a constitutional right. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Monell,* 436 U.S. at 694.

First, a plaintiff must identify an official policy of the municipality. Municipal policy encompasses a wide range of behavior, and for purposes of section 1983 liability, may consist of:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officer or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Nacogdoches County,* 379 F.3d at 309; *Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir. 1992).

Next, a plaintiff must establish that the identified policy came from a policymaker of the municipality. "A policy or custom becomes official for purposes of § 1983 when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Gros v. City of Grand Prairie*, 181 F.3d 613,

615 (5th Cir. 1999). Because a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents under section 1983, the official policy requirement was established

> to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality" — that is, acts which the municipality has officially sanctioned or ordered.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986).

Finally, a plaintiff must prove that the municipality's official policy was the driving force behind the constitutional violation. This means that there must exist a direct causal connection between the municipal policy and the constitutional deprivation, and this connection must be more than mere "but for" causation. *Piotrowski,* 237 F.3d at 580; *Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir. 1992). Causation can be established by a plaintiff's showing that the policy or custom itself violated federal law or authorized or directed the deprivation of federal rights, or, that the policy or custom was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences. *Nacogdoches County,* 379 F.3d at 309; *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 406-07 (1997). The Supreme Court has made clear that "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disre-

garded a known or obvious consequence of his action." *Bryan County*, 520 U.S. at 410. And deliberate indifference is more than mere negligence, for "simple or even heightened negligence will not suffice." *Id.* at 407; *Conner v. Travis County, et al.,* 209 F.3d 794, 796 (5th Cir. 2000).

> These requirements must not be diluted, for "where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability."

*Snyder v. Trepagnier,* 142 F.3d 791, 796 (5th Cir. 1998)(quoting *Bryan County,* 520 U.S. at 415).

C.   Discussion

   1.   Violation of Plaintiff's Constitutional Rights

As a threshold matter, the Court must first consider whether the alleged facts, taken in light most favorable to Peterson, establish that the officers violated Peterson's Fourth Amendment Rights.   If the facts viewed in light most favorable to Peterson fail to show that Peterson suffered any constitutional deprivation, the City would be entitled to summary judgment on his section 1983 claim.   *See Price v. Roark,* 256 F.3d 364, 369 (5th Cir. 2001). Peterson claims two constitutional deprivations under the Fourth Amendment: unlawful detention and the excessive use of force.   The Court will review each in turn.

      a.   Unlawful Detention

Peterson argues that Officers Horner and Ballard had no reasonable basis to enter his truck and seize him.   Conversely, the City contends that "there was never an illegal detention because the officers had a right to approach the vehicle and ask questions, whether Peterson intended to answer or not."   (Def.'s Br. at 5.) The City contends, "When Peterson and his wife did not respond to the attempts to wake them up, the officers had a duty to open the car door to check on them under their community-caretaking function."   (*Id.*)   The City continues, "[W]hen Peterson struck Officer Horner, she had reasonable suspicion to detain for the purpose of investigating an assault on a police officer."   (*Id.* at 5-6.)

It is well settled that not all encounters with the police implicate the Fourth Amendment. *See Florida v. Bostick,* 501 U.S. 429, 434 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." *Terry v. Ohio,* 392 U.S. 1, 19, n.16 (1968). Here, the evidence viewed in light most favorable to Peterson establishes that the Petersons were not free to leave until after Officers Horner and Ballard had completed their investigation and released them. Thus, Kevin Peterson's encounter with Officers Horner and Ballard resulted in his temporary seizure and implicates the Fourth Amendment.

The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. CONST. AMEND. IV. This case does not involve police conduct subject to the warrant clause of the Fourth Amendment. Instead, the police conduct at issue here involves the "necessary swift action predicated upon the on-the-spot observations of the officer[s] on the beat——which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Terry,* 392 U.S. at 20. Thus, "this case must be tested by the Fourth Amendment's general proscription against unreasonable

13

searches and seizures." *Id.*

"The ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski,* 413 U.S. 433, 440 (1973). In assessing the reasonableness of a seizure, the Court must first focus on the governmental interest that allegedly justifies the official intrusion upon the constitutionally protected interests of the citizen and balance that need against the invasion that the seizure entails. *Terry,* 392 U.S. at 21-22. A seizure under the Fourth Amendment must be objectively reasonable in light of the circumstances peculiar to the case. *Whren v. United States,* 517 U.S. 806, 813 (1996). Constitutional reasonableness is not "based on the actual motivations of individual officers . . . ." *Id.*

The police may stop and temporarily seize a person based on probable cause, reasonable suspicion, or as part of the police's community-caretaking functions. *See Whren,* 517 U.S. at 818; *Terry,* 392 U.S. at 21-23; *Cady,* 413 U.S. at 447. The Supreme Court has recognized that "local police officers . . . frequently . . . engage in what . . . may be described as community-caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady,* 413 U.S. at 441. Indeed police officers are not only authorized, but are expected to exercise this community-caretaking function. "In the course of exercising this noninvesti-gatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public

14

and/or the individual, regardless of any suspected criminal activity." *United States v. King,* 990 F.2d 1552, 1560 (10th Cir. 1993)(citing *United States v. Rideau,* 949 F.2d 718, 720 (5th Cir. 1991)(officers stopped defendant for his own safety and safety of others after observing him standing in middle of road at night, in dark clothes, and apparently intoxicated) *vacated on other grounds,* 969 F.2d 1572 (*en banc*)(agreeing with panel on this point)).

But whether a temporary seizure is based on probable cause, reasonable suspicion, or for a reason that is "wholly unrelated to the desire to prosecute for crime," *Terry,* 392 U.S. at 13, the objective-reasonableness inquiry of a court does not change. Thus,

> in justifying the particular intrusion the police officer must be able to point to spe-cific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes mean-ingful only when it is assured that at some point the conduct of those charged with en-forcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reason-able caution in the belief that the action taken was appropriate?

*Terry,* 392 U.S. at 21-22. The scope of the intrusion "must be strictly tied to and justified by the circumstances [that] rendered its initiation permissible." *Id.* at 19.[9]

---

[9] The Court recognizes that in *Corbin v. Texas,* 85 S.W.3d 272, 277 (Tex. Crim. App. 2002), the Texas appellate court held that "a police officer may not properly invoke his community-caretaking function if he is primarily motivated

Here, the officers were called to the scene on a report of a suspicious truck parked in a dark area of a lot that was not open to the public for parking. The caller also reported two suspicious persons in the vehicle and there is evidence in the record that suggests the officers were informed that the caller was concerned for the persons' well being. At this point, Officers Horner and Ballard not only had authority to respond and investigate, they had a duty to do so. Thus, Officers Horner and Ballard had the authority to approach the Petersons' truck and investigate the call.

When they approached, they noticed two individuals in the truck that appeared to be unconscious. Officer Ballard stated that his first concern was to make sure that the Petersons were alright. (Pl.'s App. at 15.) The officers' testimonies reveal that the Petersons did not respond to the officers' repeated verbal attempts to wake them up. According to Officer Ballard, "[W]e didn't know if either one or two of them were simply intoxicated or had been hit in the head and left there, robbed . . . . [W]e just didn't know until we made contact." (*Id.* at 13.)

Peterson places great weight on the fact that "the two officers . . . can't even agree upon the alleged basis for entering

by a non-community-caretaking purpose." The Court disagrees with *Corbin*. As discussed above, the Supreme Court has steadfastly held that the subjective motivations of an officer will not defeat a search or seizure that is objectively reasonable under the circumstances of a particular case. *See Georgia v. Randolph*, 547 U.S. 103, 138 (2005)("This Court has rejected subjective motivations of police officers in assessing Fourth Amendment questions . . . ."). Indeed, the Supreme Court in both *Terry* and *Cady* recognized that police officers may conduct a search or seizure for reasons wholly unrelated to the investigation of criminal activity. Nevertheless, the inquiry has remained the same, whether the search or seizure was objectively reasonable irrespective of the subjective motivations of the officer for conducting the search or seizure.

the vehicle and contacting Kevin." (Pl.'s Br. at 11.)  He points

out that Officer Ballard said he suspected the crimes of assault

and public intoxication while Officer Horner said she suspected

trespassing and possible intoxication.  Regardless of those

purported bases, Peterson argues that it was objectively unreason-

able for the officers to make contact and briefly detain him

because "there were no signs posted warning of trespass, . . . the

parking was in a public area . . . where people often slept

overnight, . . . there were no weapons visible, [and] . . . there

was no evidence of wounds, a struggle or a fight . . . ." (*Id.* at

12.)

    Peterson fails to address, however, the officers' articulated

concerns for ensuring the Petersons' well being.  Until the

officers were able to wake the Petersons and briefly question them,

it was unclear whether they were just sleeping or were in need of

assistance.  Just because there were no signs in plain view of foul

play does not mean the Petersons could not have been the victims of

a crime.  Further, the Petersons could have been suffering from

alcoholic poisoning.  Based on an objective view, it was reasonable

for the officers to further investigate into the Petersons' well

being when the Petersons failed to respond to the officers' verbal

attempts to wake them.  The Court has no doubt that had the

officers failed to inquire into the Petersons' well being and it

turned out that the Petersons were in need of assistance, the

Petersons would have demanded that the officers be disciplined for

dereliction of duty.  Thus, the Court concludes that Peterson's

brief detention by the officers did not violate his Fourth Amendment right against unreasonable seizures.

### b.    Excessive Use Of Force

Turning now to Peterson's excessive-use-of-force claim, Peterson argues the officers used excessive force when they forcibly removed him from the truck and when Officer Ballard delivered a knee strike to Peterson's thigh.  It is well settled that the excessive use of force in effectuating an arrest or even a brief *Terry*-type investigatory detention violates the Fourth Amendment.  *See Graham v. Connor,* 490 U.S. 386, 394-95 (1989); *Ikerd v. Blair,* 101 F.3d 430, 433 (5th Cir. 1996).  To "state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreason-able."  *Ikerd,* 101 F.3d at 433-34 (internal quotations and citations omitted).

Peterson has alleged that the ruptured femoral artery in his thigh resulted directly and only from Officer Ballard's knee strike.  For purposes of its summary-judgment motion, the City has conceded that Officer Ballard did in fact strike Peterson in the thigh with his knee.  (Def.'s Br. at 8.)  The City's argument is that the officers' use of force was reasonable under the totality

of the circumstances.[10]

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396. In deciding whether the force used was reasonable, the Court undertakes a similar balancing to that used in determining whether a search or seizure was reasonable under the Fourth Amendment. *Id.*

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake . . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . . The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . .

*Id.* at 396-97 (internal quotations and citations omitted). The inquiry is an objective one. *Id.* at 397. And the crucial question is

> whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to

---

[10] The City does not address whether Peterson's injury resulted directly and only from Officer Ballard's knee strike in its summary-judgment motion. Thus, for purposes of this motion, the Court will consider that element conceded.

> their underlying intent or motivation . . . .
> An officer's evil intentions will not make a
> Fourth Amendment violation out of an objec-
> tively reasonable use of force; nor will an
> officer's good intentions make an objectively
> unreasonable use of force constitutional.

*Id.* Here, the Court concludes that the officers' actions were objectively reasonable.

Even when viewed in light most favorable to Peterson, the evidence shows that Peterson was initially combative and resisted the officers' attempts to briefly detain and question him. The officers were faced with a situation of not knowing why two individuals were unconscious in a vehicle parked in a dark area of a lot, while out in the open, not open to the general public for parking. The circumstances objectively reveal that the officers needed to make contact with the Petersons to dispel any possible suspicious activity and to ascertain their well being. The government interest here justifies a brief detention and the use of force necessary to effect the detention.

According to Officer Horner, when she woke Peterson, he began to kick at her such that she had to move away to avoid being hit. Officer Ballard recounts Peterson's kicking Officer Horner in the chest. She continually identified herself as a police officer and informed Peterson that he needed to get out of the truck so that the officers could speak with him. Instead, Peterson ignored her commands and attempted to go back to sleep. When she reached in again to prevent him from going back to sleep, Peterson struck Officer Horner on her forearm. It was at this point, according to Officer Horner, that Officer Ballard came over to assist her in

forcibly removing Peterson from the truck. Officer Ballard states that he reached in, grabbed Peterson by his belt and arm and dragged him out of the truck.[11]

Even after being forcibly removed from the truck, Peterson continued to resist. Officer Ballard states that Peterson struggled to escape his grasp and tried to turn to face Officer Ballard. According to Officer Ballard, "Once we had him out of the truck, that's when he still continued to fail to comply. He wouldn't stand still. He was pulling away from us . . . . He [took] an aggressive stance toward us and [did] not [comply] to what we're asking him to do. (Def.'s App. at 28-29.) Faced with a belligerent individual whom Officer Ballard knew had been drinking (Officer Ballard testified that he could smell alcohol), he resorted to his training and delivered a strike to Peterson's thigh with his knee to get Peterson to stop resisting.

Peterson offers very little evidence regarding his resistence. He states,

> I can't recall putting up any resistance; but
> I was being attacked by two people. I didn't
> know they were police officers, because I just
> woke up when they drug me out of the truck.
> So I might have been——I know I was confused,
> and I didn't know why I was being attacked. I
> was on the ground. I had two people on me . .
> . . Is it possible I struggled? I don't see
> much of——there wasn't much of a struggle . . .

---

[11] Peterson claims that the officers never identified themselves and that it was not until after being cuffed he realized that it was police officers who had removed him from his truck. But Peterson also states that he did not know they were police officers because he had just awakened when he was being removed from his truck. He also states that after being awakened, he was confused and did not know why this was happening to him. Based on this testimony from Peterson, the Court concludes that he is not in a position to contradict the officers' assertions that they repeatedly identified themselves to him to no avail.

> from me . . . because . . . I woke up being
> drug out of the truck and hit the ground. It
> happened so fast there wasn't any time to
> struggle. I was rolled over on my stomach,
> and both officers had my arms behind my back;
> and they put cuffs on me . . . . And one of
> them, I believe it was the man, had his knee
> on my neck . . . when they rolled me over. He
> had his knee on my neck, and both of them
> pried my arms behind my back with brute force
> and put cuffs on me. And one of them was
> sitting on my back, and the other one had his
> knee on my neck grinding my face . . . . I
> couldn't do anything. I don't think I strug-
> gled. There wasn't any time to struggle. I
> thought I was being attacked.

(Pl.'s App. at 145.) At best, Peterson is equivocal. He states he
cannot remember if he struggled, but claims he remembers very
clearly every bit of force the officers used to detain him. He
states that he doesn't think he struggled, but he then goes on to
state that he thought he was being attacked; and he describes
conduct on the part of officers that normally occurs only when a
subject is resisting and posing a threat to the officers' safety.
And he never unequivocally denies struggling, but tries to claim
that he couldn't have because everything happened so fast. Thus,
the Court concludes that there is no genuine issue of material fact
as to whether Peterson was violent towards the officers and
actively resisted their efforts to detain him briefly for question-
ing.

The question now becomes whether the officers' use of force
was a reasonable response to Peterson's belligerence. The Court is
mindful that Peterson suffered a severe injury that may have
resulted from Officer Ballard's knee strike to Peterson's thigh.
Peterson, however, has not presented any evidence to the Court

showing that the officers or the City were aware that a knee strike to a person's thigh could potentially cause such a severe injury. Under the Fort Worth Police Department's guidelines, a knee strike is considered an intermediate use of force and not the deadly use of force or a technique that could cause serious injury. Thus, although Peterson suffered a severe injury that may have resulted from Officer Ballard's use of the knee strike, that injury will not color the Court's analysis as to the reasonableness of the use of that technique. To allow such an influence would bias the objective review of the officer's use of force with 20/20 hind-sight.[12]

Under the circumstances of this case, and resisting the temptations of 20/20 hindsight, the Court concludes that the officers use of force was not excessive. The evidence shows that the officers were aware that Peterson had been drinking. It also shows that Peterson had struck one of the officers and aggressively resisted their attempts to detain him. It is clear that Peterson's belligerence posed an immediate threat to the safety of the officers, and their conduct and use of force was a reasonable response to that threat.

According to the police department's guidelines, this level of force is appropriate "when the officer meets an actively resisting subject who represents a physical threat to the safety of the officer or attempts to use force against the officer or another but

---

[12] Conversely, an officer shooting a suspect to prevent flight or in self-defense would be considered the deadly use of force even if, after the fact, the suspect was not killed.

does not yet represent a life-endangering threat." (Def.'s App. at 49.)  Faced with just such a situation, the officers used the appropriate level of force to protect their safety and minimize Peterson's potential threat.  Even if it could be said, after the fact, that Peterson may not have posed a significant threat because he was simply unaware of his surroundings after being awakened from a deep sleep, or that this use of force may not have been necessary because he had been handcuffed, the Supreme Court has admonished that not every use of force, even if later it turns out to be unnecessary, will violate the Fourth Amendment.

> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments——in circumstances that are tense, uncertain, and rapidly evolving——about the amount of force that is necessary in a particular situation.

*Graham,* 490 U.S. at 397.  Accordingly, the Court concludes that summary judgment is appropriate.  Peterson has failed to raise a genuine issue of material fact as to whether his encounter with Officers Horner and Ballard involved the use of force excessive to the need and, thus, resulted in a violation of his Fourth Amendment rights.[13]

---

[13]  The Court recognizes that Officer Ballard testified that he did not strike Peterson in the thigh with his knee and that Officer Ballard believed that the use of such force under these circumstances would have been excessive.  It is not clear from Officer Ballard's testimony, however, whether his opinion was based on 20/20 hindsight.  Notwithstanding Officer Ballard's opinion to the contrary, the Court concludes that under the circumstances of this case, the use of force here, including the knee strike, was not unreasonable.  It should also

## 2.  Municipal Liability

Even assuming the officers violated Peterson's Fourth Amendment rights, summary judgment is still appropriate because Peterson fails to establish that a genuine issue of material fact exists as to whether a policy, practice, or custom of the City was the moving force behind his constitutional violation.  Boiled down, Peterson's claim against the City amounts to nothing more than *respondeat superior* liability for the actions of Officers Horner and Ballard.

### a.  Official Policy

Peterson fails to point to any policy of the City that was the moving force behind the conduct of the officers.  At the time of the incident, the FWPD had the following policies in place regarding the use of force and detention:

> The use of force under specified circumstances is permitted by law and is an affirmative duty and responsibility of police officers.  However, the unnecessary or excessive use of force is contrary to law, places the representative government agency in a position of civil liability, and the officer in jeopardy of civil and criminal liability and disciplinary action.  Unnecessary or excessive use of force is therefore prohibited by this department.
>
> . . .
>
> Necessary force is defined as the minimum amount of lawful force necessary to achieve a

---

be noted that Deputy Chief R.M. Manning opined, "While there is no conclusive evidence a knee strike was delivered by Officer Ballard, it appears from the details he would have been justified in using that amount of force." (Pl.'s App. at 348.)  Neither opinion influenced the Court's decison.

legitimate police objective.

. . .

Under no circumstances will the force used by an officer be greater than necessary to achieve legitimate police objectives, nor will the force be used longer than necessary to subdue the suspect, and deadly force shall not be used except as specifically provided in this directive.

. . .

Force shall not be used with the intent or purpose to punish, injure, or kill. Force shall only be used to prevent an individual from completing an act and effecting an arrest, and then, only the minimum amount of force necessary shall be used.

. . .

All use of force incidents [that] result in injury, involve the use of a chemical agent, or any use of force incident during which the level used is hard open-hand control and restraint or greater shall be reported and identified as "Use of Force by an Officer."

. . .

No officer shall falsely arrest, imprison, or cause any malicious prosecution to be instituted against any person.

. . .

No officer shall arrest any person or search any premises or persons except with a warrant of arrest, search warrant, or where such arrest or search is authorized without a warrant by law.

(Def.'s App. at 46-50.)    These  official  policies  have  been published by the FWPD and have been distributed to the officers in the department.    The evidence also shows that the officers have received  and  continue  to  receive  training  on  the  Department's

policies regarding the appropriate use of force and when detention is authorized.

In an effort to show that the FWPD had an official policy allowing for the excessive use of force, Peterson draws the Court's attention to Fort Worth Chief of Police Ralph Mendoza's deposition testimony. According to Peterson, Chief Mendoza, who is the policymaker for the FWPD, opined that "a police officer may use force to effectuate a detention/arrest even if there was no legal basis for the detention/arrest." (Pl.'s Br. at 10.) But that statement reflects his opinion and does not reflect an official policy of the FWPD. Opinions of a policymaker are not *per se* official policies. There must be some evidence that the policymaker's opinion was meant to reflect official policy or was promulgated as an official policy.

A review of Chief Mendoza's testimony, however, reveals that he did not testify that the FWPD had an official policy allowing police officers to use force to effectuate an illegal arrest or detention. Quite the opposite; Chief Mendoza testified: "I don't believe officers can use force against people without . . . there being some reasonable suspicion or probable cause that a crime has been committed or is about to be committed." (Pl.'s App. at 186.) Thus, the Court concludes that Peterson has failed to present a genuine issue of material fact that the City had an official policy that was the moving force behind his constitutional violations.

b.  Official Practice Or Custom

Peterson argues that "a pattern of excessive force" exists in the FWPD and that "this pattern of conduct put the City . . . on notice that there was a problem with use of excessive force on the part of its police officers." (Pl.'s Br. at 15, 18.) According to Peterson, "In response to a discovery request asking for other complaints of excessive force in a five year time frame, the City . . . produced boxes of internal affairs documents reflecting investigations of complaints of excessive force." (*Id.* at 15.) After attempting to "cull them down to a manageable amount of paper," Peterson states that he "was still faced with filing an approximately 900-page appendix." (*Id.*) But notwithstanding the numerous internal-affairs documents, Peterson has produced twenty-seven investigations of excessive force during the previous five years and "out of [the twenty-seven] investigations, excessive force was sustained on approximately four occasions." (*Id.* at 16.) Thus, Peterson concludes that "the use of excessive force by Fort Worth police officers is so common and well settled as to constitute a custom that fairly represents municipal policy." (*Id.* at 18.)

The Court first notes that "one act is not itself a custom. There must be a persistent and widespread practice." *Pineda v. City of Houston,* 291 F.3d 325, 329 (5th Cir. 2002)(internal quotations and citations omitted). "That is, the existence of a persistent pattern of illegal conduct, tolerated by municipal policymakers, tends to show that the subject conduct does not represent an unauthorized departure from lawful policy but instead

28

represents the realization of an *unlawful* policy." *Milam v. City of San Antonio,* 113 Fed. Appx. 622, 625 (5th Cir. 2004).

*Pineda* dealt with Houston police officers who shot and killed an individual following an unconstitutional warrantless entry into his residence. *Id.* at 327. The city produced 5000 offense reports and out of that, counsel selected 500 reports involving narcotics offenses. *Id.* at 329. Out of these 500 narcotics-offense reports, eleven of the reports memorialized a warrantless entry into a residence. *Id.* It was held that eleven incidents "cannot support a pattern of illegality in one of the nation's largest cities and police forces." *Id.*

The same is true here. While the City of Fort Worth and its police department are not as large as Houston, it is still a sizable city and police department nonetheless. Out of the boxes of internal-affairs documents reflecting investigations into police conduct over a five-year period that Peterson himself concedes was over 900 pages, he produced twenty-seven investigations regarding excessive use of force. Only four determined that excessive use force was used. That hardly amounts to a persistent and widespread practice necessary to say that the City had an unwritten custom of permitting or sanctioning the excessive use of force. *See Pineda,* 291 F.3d at 329. In fact, it demonstrates the opposite; that those incidents of excessive use of force represented a departure from the FWPD's lawful policies.[14] Thus, the Court concludes that

---

[14] While the Court has not been provided with any evidence as to how many arrests, detentions, or police encounters with citizens occurred over the past five years, the Court has no doubt that it must number in the tens of thousands.

Peterson has failed to establish a genuine issue of material fact that the use of excessive force by Fort Worth police officers is so common and widespread as to constitute a custom that fairly represents a policy of the City.

###### c.    Ratification

Peterson argues that the City "has specifically ratified the conduct of Officer Ballard and Officer Horner." (Pl.'s Br. at 19.) Peterson points out that the conduct of the officers in this case was the subject of an internal-affairs investigation.  The investigation was reviewed by the officers' chain of command and ultimately by Chief Mendoza.  After reviewing the investigation, Chief Mendoza concluded that the officers acted in compliance with the FWPD's policies and procedures and that neither officer needed to be disciplined.  Therefore, Peterson argues the City should be held liable because the City's policymaker ratified the officers' unconstitutional conduct.

The ratification theory of municipal liability has been recognized by the Supreme Court.  *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988).  There the high court stated:

> When a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.  If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because

---

Thus, eleven complaints and four sustained incidents of excessive force can hardly be said to represent a persistent and widespread problem.

their decision is final.

*Id.* (emphasis in original).  The ratification theory is commonly employed in the employment context.  "For example, if a school board, a policymaker . . ., approves a superintendent's decision to transfer an outspoken teacher, knowing of the superintendent's retaliatory motive for doing so, the government entity itself may be liable; but if the school board lacks such awareness of the basis for the decision, it has not ratified the illegality and so the district itself is not liable." *Milam,* 113 Fed. Appx. at 626.

Regardless of the context in which it is raised, the ratification theory "is necessarily cabined in several ways . . . to prevent the . . . theory from becoming a theory of *respondeat superior* . . . ." *Id.* at 627.  The mere failure to investigate a subordinate's decision does not amount to ratification.  *Id.*  And policymakers who simply go along with a subordinate's decision do not thereby vest final policymaking authority in the subordinate. *Id.*  The ratification theory must be applied with the understanding that "policymakers alone can create municipal liability, and so any violation must be causally traceable to them, not just to their subordinates."  *Id.*  Applying the ratification theory here as proposed by Peterson would turn it into *de facto respondeat superior*.

While the mere failure to investigate a police officer's conduct that allegedly violated a person's Fourth Amendment rights cannot amount to ratification, the converse must also be true: the mere decision to investigate and exonerate also cannot amount to

31

ratification.  In the example mentioned above, a school board approved, or ratified, with full knowledge, its subordinate's decision to commit an act that violates a person's constitutional rights.  Because the school board acted with full knowledge and approved the conduct **to be perpetrated by the school board's subordinate,** it can not only be said that the school board ratified such conduct, but that it was complicit.  That makes the constitutional violation traceable to the policymaker.

Here, the policymaker, the chief of police, was reviewing the conduct of his officers that had already occurred, without his knowledge or prior approval.  Although Chief Mendoza approved of the officers' conduct, he did so **after the fact** and thus it cannot be said that the officers' conduct is traceable to Chief Mendoza.  To hold the City liable because Chief Mendoza concluded that the officers acted appropriately would convert liability through ratification into *respondeat-superior* liability.  *Cf. Milam,* 113 Fed. Appx. at 627 ("It is not an easy fit because, at least facially, an illegal arrest that is completed without the involvement of any policymaker does not look like the typical situation in which a policymaker could approve the employee's decision and the basis for it such that municipal policy can be said to have caused the harm.")(Internal quotations and citations omitted.)  Thus, the Court concludes that Peterson has failed to establish a genuine issue of material fact that the City ratified the officers' conduct.

d.  Failure To Train

Peterson argues that the City was deliberately indifferent to the need for further training on the excessive use of force.  In particular, Peterson complains that there has been no training on the possible injuries that could result from a knee strike. Peterson contends that Officer Ballard testified that he did not "recall being told that there was any risk of injury from a knee strike" and that he stated that "had he had appropriate training indicating the possible ramifications of using a knee strike, that . . . would make a difference in his evaluation of his use of force."  (Pl.'s Br. at 21.)

Peterson does not offer any evidence that the City or the FWPD were aware that injuries such as that suffered by Peterson could occur from a knee strike and that training was necessary to prevent such an injury from occurring in the future.  Instead, Peterson argues, "The need for further training relating to the use of force in the [FWPD] is apparent from the records reflecting instances of complaints of excessive force by Fort Worth officers." (*Id.*)  None of those records, however, reflect a severe injury resulting from a knee strike.  That notwithstanding, Peterson contends that the City was deliberately indifferent to the need for further training.

"It is clear that a municipality's policy of failing to train its police officers can give rise to [section] 1983 liability." *Brown v. Bryan County,* 219 F.3d 450, 457 (5th Cir. 2000).  To establish a city's liability under the failure-to-train theory, a plaintiff must show (1) inadequate training procedures; (2) that

inadequate training caused the constitutional deprivation; and (3) the city's policymakers were deliberately indifferent to the need for training. *Pineda,* 291 F.3d at 332. As will be explained below, Peterson has failed to raise a genuine issue of material fact as to inadequate training and deliberate indifference.

The evidence establishes that Fort Worth police officers go through extensive training on the use of force at the police academy before becoming a police officer. The evidence also establishes that every two years police officers go through forty additional hours of continuing training that includes training on the use of force. And the evidence establishes that police officers are regularly updated on the law concerning the use of force.

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell* . . . . It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*City of Canton, Ohio, v. Harris et al.,* 489 U.S. 378, 392 (1989). Following the Supreme Court's admonition here, the Court is reluctant to second-guess the training the FWPD gives to its police officers. This is especially so where (1) there is no evidence of

a pattern of serious injuries resulting from police officers' delivering knee strikes to combative subjects; and (2) Peterson has presented evidence that over the past five years, there have been only twenty-seven instances of alleged excessive use of force by Fort Worth police officers and of those twenty-seven incidents, only four were substantiated. In light of the thousands of arrests, detentions, and police-citizen encounters that have undoubtedly occurred over the past five years, the Court cannot conclude that Peterson has raised an issue of material fact as to the adequacy of the FWPD's training on the use of force.

Moreover, Peterson presents no evidence that the City was aware of the potential injuries that could occur as a result of a knee strike or aware of the potential injuries that could result in the event a knee strike is not properly executed. Coupled with Peterson's failure to show the City's awareness, Peterson fails to show that the City was deliberately indifferent to the need to further train its police officers on the potential injuries that can result from a knee strike.

"For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Smith v. Brenoettsy,* 158 F.3d 908, 912 (5th Cir. 1998). Indeed, deliberate indifference is about intentional and culpable conduct. The test for deliberate indifference requires that a municipality have actual knowledge that its training is inadequate and will result in a constitutional

violation or that it is so readily obvious that its training is inadequate and will result in a constitutional violation that the municipality must be charged with actual knowledge; and notwithstanding this knowledge, the municipality acted intentionally and consciously in disregard of a probable constitutional violation or risk of serious harm.

To survive summary judgment on a theory of inadequate training, a plaintiff usually must demonstrate a pattern of violations that establishes an obvious need for improved training to prevent an almost certain constitutional violation.

> It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury . . . . To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under [section] 1983.

*Harris,* 489 U.S. at 390-91. Here, Peterson has failed to establish a genuine issue of material fact as to the City's deliberate indifference to the need to further train its police officers on the dangers associated with executing a knee strike.


e.    Failure To Supervise

Finally, Peterson argues that the City is liable because it failed to adequately supervise Officers Horner and Ballard.

Peterson contends, "The chain of command repeatedly allows use of excessive force, as well as illegal entries and searches, to go unchecked, while disciplining officers for things such as not filling out reports correctly." (Pl.'s Br. at 22.) But then he claims that "an example of the failure to supervise . . . is the fact that Officer Horner admittedly violated policy by failing to fill out a use of force report after she saw Officer Ballard use a distractionary strike." (*Id.*) Peterson complains that "there was no follow-up with Officer Horner and she was not disciplined or counseled." (*Id.*)

The Court has already addressed Peterson's failure to present a pattern of the excessive use of force by Fort Worth police officers. Peterson has not presented the Court with any evidence that Fort Worth police officers have a pattern of conducting illegal entries or searches either. Furthermore, internal affairs fully investigated the allegation that Officer Horner did not properly fill out her report noting Officer Ballard's use of force. Sergeant M. W. Decker, who conducted the investigation, concluded,

> I have spoken with Officer Horner regarding this incident. She has shown great regret regarding how she handled this call and its subsequent results. She understands how important it is to make accurate entries on worksheets and reports. There is no indication that the officer has had problems of this nature in the past, and there are no indications she is being untruthful. In counsel with Officer Horner, she has been coached to realize the importance of accurate documentation of work product and to seek a supervisor's leadership with complex problems. It is my belief that this is an isolated incident, prompted by less than stellar judgment. There

37

is no evidence that Officer Horner was acting with intent to deceive and she made no attempt to cover her mistakes . . . . At the time of this incident, she was two months into her second year of employment with the department, and only [five] months out of training. Additional training and experience will, I believe, prevent this type of situation [from] occurring in the future.

(Pl.'s App. at 345.) The internal-affairs investigation of this incident is strong evidence that the FWPD maintains adequate supervision over the conduct of its officers.

The Fifth Circuit has recognized that "a municipality is subject to [section] 1983 liability when the municipality's policies regarding employee . . . supervision were obviously inadequate, and the resulting lack of . . . supervision was likely to (and actually did) lead to a constitutional violation." *Drake v. City of Halthom City,* 106 Fed. Appx. 897, 899 (5th Cir. 2004). Peterson has failed to meet that burden here. The fact that over the past five years there has been only twenty-seven incidents of alleged excessive use of force and, out of that there are only four substantiated cases, is a strong indication that the FWPD maintains command responsibility over its police officers. Thus, the Court concludes that Peterson has failed to establish a genuine issue of material fact as to the City's failure to supervise its police force.

### 3.  Texas Tort Claims Act

The City argues that Peterson's claim under the Texas Tort Claims Act must be dismissed because the Act "does not waive

immunity for intentional torts." (Def.'s Br. at 20.) The City points out that the Act explicitly omits intentional torts from its coverage. *See* TEX.CIV.PRAC. & REM. CODE § 101.057. Indeed, the Act provides that "a municipality cannot be liable for any claims arising out of assault, battery, false imprisonment, or any other intentional tort . . . ." *Riggs v. City of Pearland,* 177 F.R.D. 395, 405 (S.D. Tex. 1997)(use of mace by police officer not actionable). Peterson has not responded to this argument. After review, the Court agrees with the City and concludes that Peterson's claim under the Texas Tort Claims Act must be dismissed.

III.  Conclusion

Accordingly, for the above reasons, the Court GRANTS The City of Fort Worth's summary-judgment motion. All claims against the City are hereby DISMISSED WITH PREJUDICE.

SIGNED February 19, 2008.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE